## 12640

### RIVERS v. WOODSIDE NATIONAL BANK OF GREENVILLE ET AL.

(147 S. E., 661)

46

48

"The deed under attack is regular and valid on its face, which gives rise to the presumption that it is valid in all respects. Being attacked for fraud and misrepresentations, it devolved upon plaintiff to make the fraud or misrepresentations appear by clear and convincing evidence. The evidence offered for plaintiff is not of that character. It is full of glaring inconsistencies of a substantial sort, and in some particulars is too far at variance with the natural and usual course of human conduct to inspire belief.

"There can be no question that the books of the bank did not show any indebtedness by the partnership to the bank. Neither the acceptances nor the drafts with bills of lading attached represented indebtedness of the partnership to any one; and the $100,000 partnership note had been sold by the

bank to a New York bank without recourse. The only indebtedness of the partnership to the bank arose by reason of the papers being forged, and at the time the plaintiff executed the deed the only forgeries the bank knew of were the acceptances. It gave Rivers all the information it had, as well as the source of its information, Harrison. The plaintiff has entirely failed to show that the bank misrepresented the situation to her or to her husband, who acted as her agent.

"The testimony is far from convincing as to the existence of any agreement to continue the business, with Harrison in charge, if Mrs. Rivers conveyed her home to the bank. The cotton business cannot be carried on without the use of drafts, warehouse receipts, bills of lading, and other forms of commercial paper. It scarcely seems reasonable that, at the very time the bank discovered that Harrison had uttered forgeries which cost the bank a loss of $132,000, it should propose to finance the business with him in charge when this necessarily would involve the handling of negotiable paper for him. In so far as the record shows, there was never any mention of this alleged agreement by any one to Rivers except by the bank, and yet both Harrison's and Gilmore's assent as partners was necessary if it was to be put into effect. Neither Gilmore nor Harrison's wife or mother has come forward to testify to the agreement, and neither of the latter appears to have complained of the circumstances under which they conveyed their property to the bank.

"It is also worthy of notice that, while the Rivers deed was executed and delivered on March 6, 1924, nothing was ever said in the way of repudiation of it until December, 1925, when this suit was brought. In the meantime—as the officers of the bank testify and Rivers did not deny—Rivers on several occasions made statements to officers of the bank which he would not have made if he had not regarded the deed as honestly obtained and valid.

"On the whole, without reviewing in further detail the mass of conflicting testimony, I am convinced that the deed

was fairly obtained by the bank, without fraud or misrepresentation, and in the manner and under the circumstances stated by its officers. The deed being in all other respects valid, and there being no equity in the complaint, it follows that the deed should be adjudged valid and the complaint dismissed.

"It is therefore ordered, adjudged, and decreed that the deed of Norma Bass Rivers to J. B. Ricketts, attorney, dated March 6, 1924 (a copy of which is attached to the complaint), is a good and valid conveyance, in fee simple, of the property therein described; that the said J. B. Ricketts, attorney, is entitled to immediate possession of the premises; that the complaint be dismissed, the costs to be taxed against the plaintiff; and that the defendants have leave to apply at the foot of this decree for further relief, if desired."

The report of Probate Judge H. E. Bailey, sitting as Special Referee, mentioned in the dissenting opinion, was as follows:

"This is an action to set aside a deed executed by the plaintiff on March 6, 1924, whereby she conveyed to the defendant, J. B. Ricketts, attorney, certain real estate located near the City of Anderson, County and State aforesaid. The plaintiff prays that this deed be declared null and void, and proper entry made to that effect upon the records of the Clerk of Court's office, where the same has been duly recorded.

"The grounds upon which the Court is asked to grant this relief are certain false and fraudulent representations made to the plaintiff and her husband, A. B. Rivers, before the deed was executed, and which the plaintiff contends influenced her to make the deed.

"After due notice to the parties, a reference was held by me on July 14, 1926. The testimony was taken on this day, it being agreed that it should be taken stenographically by W. D. White, Esq., signatures of witnesses being waived, and the stenographer's report, consisting of 137 typewritten

pages, is hereby certified to the Court as the evidence upon which this report is based.

"At later date the matter was fully argued before me by counsel, and I have given the matter long and deep consideration. After weeks of study, I have reached the following conclusions of law and fact:

### "CONCLUSIONS OF FACT

"It appears from the evidence that A. B. Rivers, husband of the plaintiff, was one of the members of a partnership with offices in Anderson, S. C., and Greenville, S. C., operating under the name of the Anderson Cotton Company. The members of the firm were B. W. Harrison, K. D. Gilmore and A. B. Rivers. Mr. Rivers lived in Anderson and had charge of the office there. Mr. Harrison was the main principal in the firm and with Mr. Gilmore operated the main office of the company in Greenville, S. C., having offices in the Woodside Building, the seventeen-story skyscraper on Main Street. The partnership had been in existence some year or so prior to March 6, 1924.

"It further appears from the evidence that over a period of about three weeks proir to March 5, 1924, the Woodside National Bank had been lending the Anderson Cotton Company, through B. W. Harrison, large sums of money. The loans to the partnership at that time aggregated $300,000, and loans to Harrison individually amounted to about $75,-000, making a total indebtedness by the two of $375,000. At this time the combined capital and surplus of the bank was $310,000. Mr. John L. Williams, vice president of the bank, testified: 'As far as the Woodside National Bank was concerned, the Anderson Cotton Company and B. W. Harrison were practically synonymous.'

"As already pointed out, Mr. Rivers was in charge of the Anderson office, where he lived, and the bank officials who made these loans admitted that they never consulted him about them. They were looking to Harrison almost entirely. Mr. Rivers testified that he knew very little of

what was going on in the Greenville office and that he did not know Harrison was negotiating any of these loans. There is nothing in the testimony to disprove his statement.

"On the night of March 4, 1924, as the culmination of a number of events, the bank officials got Harrison down to the bank, and there he confessed that certain negotiable paper which they held as collateral were forgeries. The bank officials contend that at this time he only advised them that the trade acceptances on the Anderson Cotton Mills were forgeries. Mr. Rivers testified that the bank officials told him that Harrison had also confessed to forging warehouse receipts. On that same night the bank began to take assignments from Harrison and Gilmore to protect the bank and its connections.

"The next morning, on March 5, 1924, Mr. Rivers was called to Greenville and when he arrived Harrison made a statement of the conditions. In response to questions, Harrison said that he was involved 'about $100,000.00.' In keeping with the promise made by him to Mr. John L. Williams, the vice president of the bank, the night before, Harrison asked Rivers if he would get his wife, the plaintiff herein, to put up her property to help straighten the matter out. The members of the Greenville office had already arranged for an interview between Rivers and Mr. John L. Williams, the vice president of the bank.

"This interview was not held in the bank or any of its offices, but Mr. Williams took Mr. Rivers to an unoccupied room on one of the upper floors. Mr. Rivers said that it was on the 17th floor, the top story, while Mr. Williams said that it was on the eighth or tenth floor where the interview was held.

"There could be but one purpose for holding this interview under those circumstances, and this was secrecy. The bank officials had every legitimate reason in the world to keep this affair secret. If it had become known that Harrison had hit the bank for $375,000 there would have been

a run on the bank which nothing could have stopped. Ruin was staring them in the face, and naturally they wanted to protect the bank and its· depositors.

"Mr. Rivers testified that he told Mr. Williams that Harrison had asked him to get his wife to· put up her property, and that he would not give an answer until he had seen a lawyer. He says that Mr. Williams asked him not to do this, that the bank wanted to· keep the matter quiet. I find as a matter of fact that Mr. Williams did make this statement. I feel satisfied that the bank officials in the great emergency which confronted them made statements which they do not now recall, being actuated by the laudable motive of protecting the bank, its stockholders and depositors.

"Mr. Rivers further testified that he informed Mr. Williams that Harrison had said he was involved about $100,000, and that Mr. Williams did not dispute the statement. Mr. Williams said that at his interview Rivers asked him 'how much we had of these papers that were forged, and I told him it was over $100,000.00.'

"There is no denial that Mr. Rivers asked the bank officials how much was involved, *and the only figure any of them ever mentioned was 'One Hundred Thousand Dollars.'*

"There is no doubt that this question was uppermost upon Rivers' mind. He was being asked to have his wife to put up their home in Anderson in an effort to straighten out the affairs of the partnership. As Rivers expressed it, the plan was for Mrs. B. W. Harrison, Harrison's mother, Mrs. Rivers and the partners to put up their various properties and finance the thing through. With all this collateral and the property, the securing and ultimate payment of $100,000 was not an unsurmountable undertaking.

"I have no doubt that the bank officials offered every assistance to get this unfortunate matter cleared up without any publicity. Mrs. Rivers testified that he relied implicitly upon the statement that the indebtedness was around $100,000, and that if he had known that the loss was $300,000 or

any material sum in the rise of $100,000 that he would not have asked his wife to sign the deed, nor would he have permitted her to do so.

"The plaintiff likewise testified on cross examination that she was informed that 'the indebtedness of the Company was around $100,000.00,' and that when she was first introduced to Mr. Ricketts and Mr. Williams, who were respectively trust officer and vice president of the bank, Mr. Ricketts state to her 'that they (the bank) would keep it (her home) for temporary security so the business could continue and he was quite sure that everything would turn out all right.' Relying upon these statements plaintiff signed the deed, for no money consideration whatsoever, on March 6, 1924. It was made to J. B. Ricketts, attorney, whom the testimony shows was acting for the bank.

"I conclude as a matter of fact that Mr. Rivers and his wife did rely upon this material representation of the bank officials; that the plaintiff and her husband believed these statements to be true, and that the deed would not have been executed but for these misrepresentations.

"I find as a matter of fact that this statement as to the amount of the indebtedness was false as the admitted indebtedness upon forged securities and collateral was $300,-000 to the firm and $75,000 to Harrison individually. I conclude as a matter of fact that Mr. Rivers would not have asked his wife to sign the deed, nor would plaintiff have signed it, if this fact had been known.

"There is nothing to show that Mr. Rivers was criminally involved in the slightest. The testimony shows that he was indicted along with other members of the firm in the United States District Court, upon a charge of conspiracy, which permitted a wide latitude of testimony, and he was acquitted by the jury, and I find as a matter of fact that he was not in any way actuated by a desire to aid himself to evade criminal responsibility.

"A significant fact showing that the bank officials were doing all in their power to secure secrecy was developed during the testimony. On the night of the 4th of March assignments were taken from the Greenville partners of everything they could assign, including two fine Lincoln automobiles, the property of Harrison and Gilmore. These cars were practically new and worth approximately $5,000 each, yet they were allowed to continue in possession of the cars until after Harrison's arrest upon criminal charges about March 14th.

"I conclude as a matter of fact that the bank officials knew, or ought to have known, on March 5, 1924, that the indebtedness of the Anderson Cotton Company and Harrison amounted to the enormous sum of $375,000. They could have given Mr. Rivers and the plaintiff the exact figures in a few minutes, and it was their duty to have done so. I also conclude as a matter of fact that neither plaintiff nor her husband knew the truth, and under the circumstances had no reasonable way to have ascertained it. Regardless of the motive of the bank officials, I find that they did make the misrepresentations to Mr. Rivers and the plaintiff for which they should be held liable.

## "Conclusions of Law

"Although the bank officials may not have intended to perpetrate an actual fraud upon the plaintiff, yet in law and equity the bank cannot escape the results of their actual misrepresentations. If an untrue statement was made at the time, concerning a material matter, upon which another party acted, the bank is responsible, even though there may not have been a dishonest intention at the time.

"The South Carolina Supreme Court has already recognized the doctrine of constructive fraud.

"In the case of *Lagrone v. Timmerman*, 46 S. C., 409, 24 S. E., 298, the law was so clearly decided that it has never been questioned since. It is conclusive here in my opinion. The Court said:

" 'The sixth, seventh, ninth, and eleventh grounds of appeal make substantially the same question, and may, therefore, be considered together. That question is, whether the defendants can be held liable without proof of actual moral fraud on their part. That point is so conclusively determined by the authorities in this State adversely to the view contended for by appellants, that we need not go elsewhere for authority, though much of it will be found collected in our own cases, upon which we shall rest our conclusions. In *Bank v. Wray,* 4 Strob., 87, it was held, expressly affirming the previous case of *Edings v. Brown,* 1 Rich., 255, that if one signed a note or endorsed a bill, as agent, when he is not agent, he is personally liable, *although he do so bona fide,* and does no other act to deceive or mislead the person with whom he deals, except by the assumption of agency when he is not agent. Falsehood and deceit are not necessary to charge an agent personally with a contract he had no authority to make. In the opinion of the Court in that case we find language so pertinent to the present case that we quote and adopt it here: *"The injury proceeded from the act of the defendant.* He would evade liability under the plea of innocent mistake. In a moral sense, the act of defendant may have been innocent, for he had no desire or apprehension of mischief to his principal but in its practical effect, it was not innocent. * * * But even when the agent *bona fide* believes he has authority to contract and has not, he is still personally liable. In such cases, it is true, the agent is not actuated by any fraudulent motive, nor has he made any statement which he knows was untrue. But his liability depends on the same principle as in the first case."

" 'In this case, the Court takes pleasure in saying that the evidence does not justify any imputation of moral fraud or intentional wrong on the part of the defendants; and, indeed, we do not understand that any such imputation is made. But, under the principles laid down in the cases above cited, in which cases of the highest authority elsewhere are

reviewed, we must hold that the absence of moral fraud or intentional wrongdoing on the part of the defendants is not sufficient to relieve them from liability. If follows, therefore, that these grounds must be overruled.'

"If it should be conceded that in this case there is an absence of moral fraud and intentional wrongdoing, nevertheless, when considered in the light of the foregoing quotation the bank's liability for the false statements of its officials becomes so obvious as to require the citation of no further authority.

"I therefore conclude as a matter of law that the Woodside National Bank is liable for the misstatements of fact made by its officials. The statements made by them were untrue and very material, and the bank must be held responsible for them, although there may not have been an actual intent to commit an actual moral fraud at the time.

"But it is contended that plaintiff's husband, A. B. Rivers, had equal opportunity to know the truth. I am aware of a line of decisions in South Carolina, such as *Whitman v. S. A. L. Ry. Co.,* 107 S. C., 200, 92 S. E., 861, L. R. A., 1917-F, 717, and others, which hold that 'fraud action cannot be maintained, where plaintiff had abundant opportunity to ascertain the truth.'

"I do not think the plaintiff had this opportunity. The bank officials asked him not to say anything about the matter to the bookkeeper. As already pointed out, the bank officials were making every effort to keep the matter quiet. Mr. Rivers testified that he knew nothing of the bookkeeping methods, and that he could not have ascertained the amount of the indebtedness without the assistance of Mr. Boleman, the bookkeeper. As far as that is concerned, he had every reason to believe that the books would not give accurate information. If his partner had forged collateral to put up with the bank, he had every reason to believe that the books would have false entries. If he had looked at the books and seen entries of the various notes, he would not have been

able to have found the credits which may or may not have been made. The books are somewhat intricate, and only an expert could check them up properly. On the contrary, Mr. Rivers had every right in the world to believe the bank officials knew the correct amount. As between his partner, and the books kept under his direction, upon the one side, and officials of a national bank upon the other, he had every reason to accept the statement of the bank. If he had called upon the bookkeeper for information, which he would unquestionably have had to have done in order to understand the books, the very object of the bank to maintain secrecy would have been defeated.

"I therefore conclude as a matter of law that the plaintiff did not have an equal opportunity with the bank officials to know the truth.

"In conclusion, I recommend that the plaintiff be granted the relief prayed for in the complaint, to wit: That the deed executed by her on March 6, 1924, to J. B. Ricketts, attorney, be set aside and canceled and that the same be declared null and void, and that the record of the deed in the Clerk's office at Anderson, in the County and State aforesaid, be appropriately indorsed showing the complete satisfaction thereof. I further recommend that the defendant pay the costs of this action."

*Messrs. Thos. Allen,* and *Price & Poag,* for appellant,

*Messrs. Nettles & Oxner,* and *Watkins & Prince,* for respondents,

April 10, 1929.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

This is a cause in equity, and it is incumbent upon the appellant to convince the Court that the Circuit Judge was in error in the conclusions reached by him as to the facts. We have not been so convinced. The cause depends entirely upon the facts, as there is no error of law. The decree of the Circuit Judge, Hon. T. S. Sease, will be reported, and it is affirmed.

Mr. Chief Justice Watts and Mr. Justice Cothran concur.

Mr. Justice Stabler (dissenting): After a careful study of the case, I am convinced that the judgment of this Court should be in accordance with the conclusions of the Special Referee. Let his report be incorporated in the report of the case.

Mr. Justice Carter concurs.